Judge Wood
delivered the opinion of the court:
The motion for a new trial assigns the following ground:
I. That the verdict is against the law as laid down by the court.
2. That it is against the weight of the evidence given in the cause.
*3. That the court erred in admitting the master of the boat as a witness for the plaintiff.
4. Because by the verdict rendered in the suit wherein said A. P. Howell is plaintiff, and the Protection Insurance Company is defendant, upon the same evidence read and adduced in this cause, it is found by the jury that the plaintiff is entitled, as will be insisted, to recover only for a partial loss.; and if so, then the amount of the recovery, in this suit, must be proportionally released or remitted altogether.
5. That it further appears, by the finding of said jury, in the said suit of Howell v. Protection Insurance Company (which finding was subsequent to the verdict between the parties to this suit), that the whole value of the boat, on December 1, 1831, was but eight thousand dollars, and on the day of the alleged loss but six thousand five hundred dollars; and the defendants, thereupon, will insist that the valuation in said policy can be opened up and the actual value fixed by the finding aforesaid.
6. That if said value, as found by said jury, is to obtain in the decision of this cause, then the verdict in this suit is to be modified to meet the state of facts.
The court are asked, if they do not grant a new trial, to reform and modify the verdict, in amount, to suit the facts of the case under the law.
In support of the first and second positions assumed by the counsel for the motion, it is insisted that a loss arising from the negligence of unskillfulness of the captain is not such a loss as charges the underwriter in the ordinary forms of policies unless barratry is insured against; and, as this policy includes no clause against barratry, the underwriters are liable only for losses occasioned by the perils of the river, which skillful and careful men would be subject to. By a reference to the minutes of the judge who presided on the trial, it appears that the law was given to the jury *282 as the counsel for the motion claim that it is. They were instructed, that before the insurer was to be made liable, they must be reasonably satisfied, from the evidence, that the boat was lost by one of the perils insured against. That the defendant was not liable, under this policy, for any act of barratry, because it was' not one of the risks taken. That the plaintiff’s counsel relied solely for a recovery on the hypothesis that the boat was lost by one of the perils of the river; and that, by a peril of the river, they were to understand one of those natural perils *and operations of the elements which occur without the intervention of human agency, which the prudence of man could not foresee nor his strength avert. Such a peril was defined in the books a fortuitous event— an accident which the circumspection, care, and energy of the human intellect would not ordinarily avoid or resist. That it was against extraordinary perils only that the insurers undertook, and for which alone they were responsible; and it is believed that such instruction is sustained' by high authority as the law of the case. Park in his Treatise, Kent in his Commentaries, and Judge Johnson in 3 Peters, fully sustain this principle. The case then went to the jury, upon the question of law, under circumstances as favorable to the defendant as the counsel required.
It is said, however, that the verdict is not supported by the weight of the evidence, under the law, as given to the jury. This is a point much more difficult, at this time, to satisfactorily determine, and must, in some measure, be disposed of from the impression it is recollected that the evidence made on our minds on the trial.
It is sometimes the case, that the belief of the facts sworn to by a witness is much-strengthened or diminished by his appearance and manner of giving testimony- on the trial. The testimony of a single witness may' often obtain credence over twice his number who contradict him, from a knowledge of his character, his appearance and manner, when contrasted with theirs; and although they can not be directly impeached. When such evidence is placed on paper, and the court are to determine where the right of it lies, at a period of several months after it is given, aDd when the countenance of the witness nor his name can. be any longer borne in recollection, we must, in a measure, resort to an impression when everything was fresh in our mind, and be operated on by such consideration.
*283 We are asked, again, carefully to l’eview the testimony, and we have done so. Much of it is in depositions, and full notes were taken of the rest, supposed to be material 'by the judge. The principal testimony for tho plaintiff was the depositions of Briggs, King, Underwood, and tho parol evidence of Edwards and Dove-nor. Briggs was the captain, Edwards the pilot, and Dovenor the engineer of the ’76, and Underwood, the captain of another boat, and, from the evidence, of ^undoubted skill and of good character.
These witnesses were called to prove the loss of the boat, by the perils of the river, and they all agreed substantially, in their relation, when testifying about the same fact. They prove some one, or more of them, that the ’76 left Randolph in the evening of the first December; that the night was exeedingly dark "and rainy; that in coming up tho river, the boat struck on Plumb point; that the shock was severe; that neither shore of tho river could be seen at the time; that the boat was so injured as to leak and make water fast; was run across the river and lay till morning, the wind being very high. The next morning about sunrise, the boat was gotten under way and proceeded up the river. About ten o.’elock, a. m. ora little before, the boat was stopped, wooded, and again proceeded up the river in the usual track of boats navigating the Mississippi, until they struck what they believed to be thewreck of the Daniel Boone. Until this time, the boat was kept clear of water by the pumps. Edwards says he was at the wheel, as pilot of the boat at the time; that he saw the break of the Boone, but not until very close to her. That he was far enough from her to have passed her on tho outside, which he intended to do, but a sudden flaw of wind from the west, struck the stern of the boat, threw it farther into the current, and the starboard bow struck the Boone, raked the cotton from stern to stern, glanced to the shore, struck a stump, broke her bowsprit, was backed off and proceeded on her course. That above Buford’s landing, by the direction of the captain, he tried to run her on to a bar, but she sheered off, and believing she was in imminent danger, he run her with the current, gradually across the Mississippi into a bend of the river, where she finally sunk, and all the witnesses agree that she could not much longer have been kept above water. This witness says he has no doubt he should have cleared the Boone, had the wind not struck the boat *284 as he described. Briggs, Underwood, and King gave a minute history of the accident, and concurred in the main with Edwards. It was also shown, beyond question, that much was done, and all that could be reasonably done, to secure and save the boat, when she finally landed; but that she sunk, and was lost between two and four o’clock, on the morning of December 2, 1832, eight hours at least before the policy expired. These witnesses testify to no act in the management of the boat, to shake their faith in the belief that *the boat was navigated with integrity, care, and skill. This testimony, it seems to us, was amply sufficient, not only to justify, but to demand of the jury a verdict for the plaintiff according to the law, as the court gave it to the jury, so far as we have as yet progressed with the case.
We next come to the defense. It was claimed that the boat was lost by an act of barratry. 2. If not by barratry, by such carelessness as should avoid the po.licy.
Barratry is defined by Park (Park on Marine Insurance, 83, 84), “ to be any act of the master, or mariners, of a criminal nature, or which is grossly negligent, tending to their own benefit, to the prejudice of the owners of the ship, and without their consent, or privity.” Other writers say that, negligence may be so gross as to be evidence of barratry. Time need not be occupied, however, with the first point here made by the defense. It was not sustained on the trial, and upon a subsequent trial in the case of this plaintiff v. Protection Insurance Company, on the same evidence^ it wa.s abandoned; and if seems now to be abandoned by the counsel in this case. They appear to claim only, that the circumstances proved “show a wanton degree of carelessness, which ought to avoid the policy." It was also claimed on the trial, there was an understanding between the plaintiff and his captain, Briggs, and that the boat was lost by design. It is not now asserted that any evidence looked toward sustaining that position, and the court neither now, nor on the trial, had the least impression that any such fact was proved.
Wo are left, then, to inquire, whether the evidence of the defendant, shows such neglect or carelessness in the officers and crew of the boat as exempt the insurers from liability.
Many witnesses and much testimony was g’iven for the defendant on this point. It was claimed that the boat, after striking Plumb Point, was no longer seaworthy; and thaWlhere were convenient places, where the boat could put in and repaired; and *285 that by not doing so, the risk was increased, and the underwriters discharged. The court instructed the jury, that there was, in. . law, in every policy, an implied warranty, that the boat was seaworthy when the policy attached, which meant that the vessel was competent to resist the ordinary attacks of wind and weather, and was competently equipped and manned for the voyage, with a sufficient crew’, and with means to sustain them; with a
*captain of general good character and nautical skill; and if the ship became unseaworthy, during the. voyage, it was the duty of the captain to stop and repair at the first suitable and convenient port; and if he did not, and a subsequent loss ensued, the underwriters would be discharged on the ground of negligence.
Some witnesses testified that the boat might have stopped and repaired between Plumb Point and the wreck of the Boone, but no one stated that there was any place very suitable or convenient, and most of the evidence was that so long as the pumps would keep the boat clear, it was considered safe, and was the usual practice, to keep up the river to a convenient port to repair. To the court, the evidence appeared to justify the captain in continuing on his course.
■ There was much evidence given by the defendant, in relation to the running on the Boone, varying considerably from that given by the plaintiff, and the same may be said of the subsequent conduct of the captain and crew, until the loss of the boat. This evidence, in our view, however, was mostly reconcilable with that given by the plaintiff, and went to the jury, under the instruction that the law made the masters-and mariners of vessels agents for the insured, and if loss was occasioned by their negligence, the law discharges the insurers. 5 Ohio, 436. That the insurers did not insure against the negligence or want of skill of the insured or his agents. Such negligence was not covered by the policy. The court instructed the jury further that it was, nevertheless, no defense that a vessel navigated with ordinary care and skill, and by fortuitous events was placed in a perilous situation, and that the captain and officers, in the exercise of a sound discretion, did not take the proper channel, or use proper means to save the boat when she might have been saved if they acted with fidelity. The officers in such case might exercise a sound discretion and are not answerable for the result of their judgment. Under this instruc *286 lion, the court are of opinion that the verdict is sustained by the weight of evidence.
On the trial, it was claimed by the defendant’s counsel that the plaintiff was not the sole owner of the boat, when the policy attached, as he represented himself to the office, and that he misrepresented the value of the boat, she being worth much less than ten thousand dollars. The court instructed the *jury that a contract of insurance was eminently a contract of good faith, which was peculiarly enjoined upon the insured, as he possessed an entire knowledge of all the circumstances which combined to form the contract, and was bound to communicate the facts and objects which were to determine the will of the insurer. It was accordingly an established principle, that a misrepresentation to the underwriter, or concealment of a fact material to the risk, would avoid the policy; that it would avoid it, though the loss arose from a cause unconnected with the misrepresentation ; or even though the misrepresentation, or concealment, happened through mistake, neglect, or accident,, without any fraudulent intention. That the suppression of any such facts, whether by design, or mistake, or negligence, equally rendered the policy void, for the risk run became different from the one assumed in the policy ; that the law required suprema fides in the foundation of the contract; and yet, either party might 'be innocently silent ás to ground open to both for the exercise of their judgments. That a misrepresentation as to who are the owners, the captain or pilot, may come within the operation of the rule.
The evidence was, that one Gossage had been a while captain, and said he was a part owner; but it was proved by Gazzam, who knew the contract, and held the obligation', that Gossage was never part owner, because he did not perform the condition which he was to perform, to wit, to pay the note, before his ownership was to commence, and as to misrepresenting the value of-the boat, it was proved that the boat was owned in Cincinnati, where all the parties -lived, and that one knew the value, probably, about as well as the other. We are confident our impression, at the time was, that the verdict was, on both those points, supported by the evidence, and we still think so. So far, then, as the two first points in the motion are concerned, we arc of opinion that the verdict is sustained by the weight of evidence under the law, as given by the court to the jury.
*287 The next point made by the motion is the admission of the captain of the boat, as a witness for the plaintiff. Did the court err? If so, a new trial ought to be granted.
If this witness is incompetent, it must because he is interested in the event of the trial. Such an interest as will exclude him, says Starkie, must be a present, certain, vested ^interest, and not uncertain or contingent. 2 Stark. 745. A party has such an interest as will disqualify him, when the necessary legal consequences of a verdict will bo to better his situation. 2 Stark. 746.
It is not claimed the witness is interested, unless he can use the verdict of Howell v. the company in his favor. Suppose Howell had failed in a recovery, and had sued this witness for the loss, could Briggs have used the record in evidence on the trial in his favor? Howell’s failure to recover v. the company would neither be proved nor disproved by the record to have been occasioned by the negligence or carelessness of Briggs. It might have been on many other grounds, fraud, misrepresentation, concealment, by the plaintiff himself. Suppose then, in this case, Howell, having recovered, should sue Briggs for any amount he may have lost, not covered by the policy ; the record is the same, it does not show the fact that the boat was skillfully navigated, unless by implication ; but if it did, the record is between other parties, and Briggs could not use it in his favor, unless in mitigation of damages to prevent the plaintiff, so far, from receiving but one satisfaction. But suppose he could use it for this purpose. It is begging the question to say he is interested. Such position assumes that Briggs lost the boat by carelessness, negligence, or some act which makes him guilty and liable, 'when evfery legal presumption is clearly the other way. Until his liability is established for the loss of the boat, he is not incompetent; and as that has never been established, and probably never can be, for the best of reasons, that such liability does not exist, the captain must be competent. He has, at most, but an interest in the question which goes to his credibility only.
The next and fourth point made is, that the verdict rendered in a subsequent suit, when Howell was plaintiff, and the Protection Insurance Company, defendant, upon the same evidence adduced in this cause, entitles the plaintiff to recover only for a partial loss, and that the amount recovered in this suit shouLd be proportionally released, or remitted altogether.
*288 It appears to us such consequences do not follow. The same evidence which shows a partial loss in the one, shows a total loss in the other case. The policy did 'not expire in this case until noon, December 2, 1832, and the boat went down, and was wholly lost, eight hours before.
The fifth reason can not be sustained. The court can not *open up the policy because the jury, in a subsequent case, between other parties, have found that the boat was worth but eight thousand dollars when she was insured for ten thousand dollars ; or that she was worth but six thousand five hundred dollars when lost. This case is on a valued policy; the jury have by their verdict, in substance, found that there was no misrepresentation or concealment by the plaintiff to the office, and the value the parties fixed upon the boat is, in this case, conclusive.
On the sixth reason urged, we will only remark that on full consideration we are of opinion that the verdict of the jury ought not to be modified, nor in any manner interfered with, but that judgment should be entered thereon for the amount found for the plaintiff, and judgment will accordingly be entered for five thousand one hundred and fifty-six dollars and sixty-set en cents, the balance due after deducting the premium noto to May 1, 1835, being the first day of the term.
Judgment for five thousand one hundred and fifty-six dollars and sixty-seven cents.